Filed 9/23/20  P. v. Galvan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JUAN GALVAN, <br><br> Defendant and Appellant. | D075262 <br><br><br> (Super. Ct. No. SCD275534) |


APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch, Judge.  Affirmed in part, modified in part with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Juan Galvan, while under the influence of methamphetamine and marijuana, drove over a curb, struck a wall, and drove 50 feet down a sidewalk before hitting two pedestrians. One pedestrian died at the scene. The other suffered severe head injuries and sustained a brain injury.

A jury found Galvan guilty of: gross vehicular manslaughter of victim S.A. while intoxicated (Pen. Code, § 191.5, subd. (a); count 1); driving under the influence of drugs causing injury to victim C.S. (Veh. Code, § 23153, subd. (f); count 2); and hit and run with death or permanent serious injury (Veh. Code, § 20001, subd. (b)(2), count 3). For count 1, the jury found true allegations that Galvan: (1) personally inflicted great bodily injury on S.A. and C.S. (Pen. Code, § 1192.7, subd. (c)(8) [serious felony]); (2) fled the scene after committing the crime (Veh. Code, § 20001, subd. (c)); and (3) proximately caused bodily injury or death to more than one victim (Veh. Code, § 23558). For count 2, the jury found true allegations that Galvan: (1) personally inflicted great bodily injury on S.A. (Pen. Code, § 12022.7, subd. (a)); (2) personally inflicted great bodily injury causing C.S. to become comatose due to brain injury (Pen. Code, § 12022.7, subd. (b); and (3) proximately caused bodily injury or death to more than one victim (Veh. Code, § 23558). Galvan admitted he had a prison prior (Pen. Code, § 667.5, subd. (b)), a serious felony prior (Pen. Code, § 667, subd. (a)), and a strike prior (Pen. Code, §§ 667, subd. (b), 1170.12). The court sentenced Galvan to a total term of 25 years in state prison.

Galvan contends his convictions for counts 1 and 2 should be reversed because his constitutional rights were violated by late discovery produced by the prosecutor during trial and because the court declined to give the jury

2

instructions regarding the defense of accident and proximate cause. He contends his conviction for count 2 should be vacated because the double jeopardy clause and Penal Code sections 654 and 1023 preclude multiple convictions and punishments for the same act. Galvan also contends the true finding of great bodily injury to S.A. in connection with count 2 must be stricken pursuant to Penal Code section 12022.7, subdivision (g). Finally, Galvan contends his constitutional rights were violated by the imposition of fines, fees, and assessments without finding Galvan had an ability to pay.

With respect to his double jeopardy argument as to count 2, Galvan acknowledges we are bound by *People v. McFarland* (1989) 47 Cal.3d 798, 803–804, which held a defendant driving under the influence may be convicted and punished separately for killing one victim and injuring another in the same incident. We conclude Galvan forfeited his claim regarding the fines and fees and we further conclude there were no prejudicial errors with respect to Galvan's other contentions. However, on our own motion, we strike the stayed one-year sentence enhancement for Galvan's prior prison commitment because his prior conviction no longer qualifies for enhancement under amended Penal Code section 667.5, subdivision (b). In all other respects, we affirm the judgment.

II

BACKGROUND

A

On the evening of February 3, 2018, victims S.A. and C.S. left their home for an evening walk around 5 p.m. A little later, their roommate heard a bang near the side of the house. When the roommate went outside, he saw S.A. pinned under a truck on the sidewalk just a few feet from their home. C.S. was bleeding and shaking on the ground.

3

S.A. died at the scene. Among other injuries, C.S. suffered a traumatic brain injury and was in a coma for a period of time. C.S. was hospitalized for nearly two months. She showed some improvement after discharge, but was still non-verbal at the time of trial.

B

Witness B.G. drove along a public road behind a black truck on the evening of February 3, 2018. B.G. did not notice anything unusual about how the truck was driving.

Suddenly, the truck made an unindicated left turn onto another street. However, a couple of feet into the turn, the truck suddenly turned back toward the main road. The truck hit the curb, jumped onto the sidewalk, slammed into a wall, and eventually slammed into a pole on the block wall.

B.G. stopped his vehicle and got out to see if the person in the black truck was okay. B.G. asked Galvan, who was alone in the truck, if he was okay.

After Galvan said he was okay, B.G. looked down and saw a man pinned underneath the truck. As B.G. walked around the front of the truck to try to push it back, he saw a female lying face down close to the wall. She was breathing heavily. When B.G. told Galvan to move his truck, Galvan panicked. He jumped twice in the air and said he could not believe it. Another man who arrived on the scene helped B.G. try to push the truck as Galvan got into the truck and tried to put it in gear. Galvan also tried pushing from the driver's side. They could not move the truck because the front tire was broken.

Witnesses saw Galvan pacing around the truck cursing and talking to himself. He got into the truck, got out again, and walked to and from the bed of the truck several times, moving items back and forth between the bed and

4

the cab of the truck.  His movements were erratic.  He appeared panicked and upset.  Several witnesses called 911.

C

The first responding officer observed a male walking eastbound on the roadway toward the police vehicle.  As the officer exited his vehicle, the man said there was a crash and a couple of people were pinned underneath the truck.  The person did not say he was the driver nor did the person provide a name or license number.  The person appeared nervous.

Within a few minutes of the arrival of police and paramedics, one of the witnesses noticed the driver was gone.  The witness saw Galvan walking up the street.  The witness told the responding officer the driver was leaving.  The officer radioed another patrol unit and told them to detain Galvan because the officer suspected he might be involved in the collision and was attempting to leave the scene.  The witness followed Galvan and saw him turn up another street where Galvan started jogging.  The witness pointed out Galvan to another group of officers who detained Galvan.  Witnesses identified Galvan as the driver of the truck.

D

When officers contacted Galvan, he appeared animated.  He could not control his hand movements and his speech was rambling.  He was not able to answer simple questions.  It appeared he was under the influence of a controlled substance.

Galvan initially denied being the driver and named another individual as the driver.  He also denied using drugs within the past 48 hours.  He said he last used marijuana a week prior and he had not used methamphetamine in three weeks.

5

During a field sobriety test, he had some difficulty following instructions and there were signs of impairment. Galvan appeared wide-eyed. His eyes were bloodshot and glazed and his pupils were dilated. He also swayed. The officer believed there was enough evidence of impairment to place Galvan under arrest. He suspected Galvan was under the influence of methamphetamine. The officer did not believe Galvan was safe to drive a vehicle.

After conducting a further drug recognition evaluation at the police station, the officer formed the opinion that Galvan was under the influence of both a central nervous system stimulant and a central nervous system depressant. A rapid oral test was positive for methamphetamine.

During the evaluation at the station, Galvan eventually admitted he drove the truck and that he was alone when he was driving. He then said he did not remember anything but a flash. He thought he was hit from behind. He also claimed someone was trying to kill him the day before.

Galvan admitted he left the scene. He said he was going to see if he could warn the family of the victims. When the officer advised Galvan that someone died in the collision, Galvan became distraught. He said he would not have let the police catch him if he had known someone had died.

E

Blood drawn from Galvan more than four hours after the collision tested positive for methamphetamine at 141 nanograms per millimeter and amphetamine at 15 nanograms per millimeter. He also tested positive for cannabinoids.

The toxicologist testified methamphetamine is a central nervous system stimulant. It can speed up thought processes, alter perceptions of time, and cause an individual to be easily distracted. Physically, it can cause

6

a person to appear hyperactive or fidgety and to have wide eyes, rigid muscle tone, sweating, and elevated pulse rate. It can cause pupils to be more dilated. The half-life for methamphetamine, meaning the period of time it takes a drug to reduce to half in the blood, is 12 hours on average.

Methamphetamine can affect the ability to safely operate a motor vehicle. It can impair the ability to multitask and divide attention. It can alter perceptions of time and speed and can affect physical coordination. It can interfere with the ability to make a decision and act on that decision in an appropriate amount of time. Common driving patterns with methamphetamine can include inattentive driving, speeding, erratic driving, and inability to maintain a lane of travel.

Marijuana can have both depressant and stimulant effects. Many of the effects of marijuana on mental abilities are like the effects of methamphetamine, such as divided attention skills, perception of time, coordination, and response and reaction time. It can also affect short-term memory and depth perception. Driving patterns of individuals under the influence of marijuana are often described as serpentine because the individual can weave and drift out of the lane of travel. When an individual has multiple drugs in his or her system, he or she may show a combination of responses or more effect of one drug over the other.

Based on the results of Galvan's blood work and a hypothetical mirroring Galvan's driving pattern and his field sobriety test results, the toxicologist believed Galvan was driving under the influence of both methamphetamine and marijuana.

F

Investigating officers observed no tire marks in the roadway to indicate braking. The officer investigating and documenting the scene observed a tire

7

mark on the curb, a mark where a tire rolled through the grass, a tire mark on the sidewalk, and the impact of the vehicle with the wall. Pieces of rubber were on the ground near where the vehicle impacted the wall. The officer testified the tire exploded from contact with the wall. A wider and uneven tire mark was left on the sidewalk from where the tire deflated to the point of rest of the vehicle. No evidence was found in the roadway.

Officers determined the cause of the accident was unsafe movement to the left in violation of Vehicle Code section 22107 because Galvan did not maintain the curvature of the roadway. The vehicle traveled 60 to 70 feet from the point of impact on the curb to the point of rest. It traveled about 50 feet from the time it hit the curb until it hit the pedestrians.

B.G.'s vehicle did not hit Galvan's truck. B.G.'s vehicle did not have any damage suggesting he had been in a collision. Galvan's vehicle had rear-end damage from an earlier collision.

A mechanical inspection of Galvan's vehicle showed damage on the left side of the vehicle. The left front tire was deflated and the wheel rim was fractured so the tire became completely dislodged from the rim. This indicated the tire hit the curb with enough energy to fracture the alloy rim.

The inspection revealed no mechanical failures that could have caused or contributed to the collision. A brake component was installed upside down, but the brakes still worked properly. It could decrease braking ability by less than 10 percent. It would not prevent the driver from coming to a complete stop and might only reduce stopping time by fractions of a second. There were five inches of free play in the steering wheel, which is beyond the federal limit. However, this free play would not result in a catastrophic steering failure or affect the driver's ability to steer the vehicle.

8

## G

Galvan testified in his own defense. He started using marijuana before kindergarten and started using methamphetamine at age 12. He injected methamphetamine and heroin between the ages of 15 and 21. He stopped using drugs for two years, got a job as a construction laborer, got married, and had a child. However, he relapsed in December 2017. After he relapsed, drug use made him happy and relieved his depression and anxiety.

The day before the incident, Galvan's truck ran out of gas on a freeway and he was rear-ended by another vehicle. After getting gas, Galvan drove to visit his wife, but she did not want anything to do with him. He went to a motel with his brother and the brother's girlfriend where they smoked methamphetamine and marijuana.

Galvan denied using drugs on the day of the incident. After emptying a storage unit, he was going to a family member's house for a child's birthday celebration. He decided to stop and walk around the neighborhood because he wanted to delay his arrival at the party.

As he drove up the main road, he felt fine and the truck was working properly without any steering or tire issues. He made a left turn, but before completing the turn, he heard a loud pop. He said he was scared and decided to turn back onto the main road. He said he lost control of the vehicle and slammed into a wall.

Galvan said he was shaken awake by a man who said he had been in an accident. He heard someone say they needed to push the truck back because someone was hurt. Another person said they heard shots.

Galvan saw a man trying to push the truck backward. The man told him to put the truck in reverse. Galvan tried to turn the truck on, but could not do so. Galvan said he put the truck in neutral as others came to the hood

9

of the truck to push it.  When he got out, he saw two bodies on the ground and a pool of blood.

The truck did not move at all and Galvan saw that the tire was deflated.  He got a wrecking bar from the back of the truck and used it to try to lift the truck.

When the paramedics arrived, Galvan and the other witnesses backed up.  Galvan walked away from the scene.  He told a police officer there were two people injured underneath the truck, but he did not say he was involved in the incident.

Galvan said he heard the couple lived nearby.  Galvan said he thought he should warn the people's family.  Galvan said he was scared and confused.

When police officers contacted him and placed him in handcuffs, he told them another individual had been driving.  Galvan lied about driving because he was scared.  He said he told the officers a variety of things, including that someone was trying to kill him, he was shot at, and that he was rear ended.  However, he said all he could remember was a white flash.

Galvan did not hit the brakes before the car went up on the curb.  He never saw the pedestrians and did not remember hitting them.

Galvan denied methamphetamine use affected his brain, saying it only affected his mood.  He said he feels happy when he takes methamphetamine and marijuana together.  Galvan knew he had drugs in his system, which is why he declined a presumptive test in the field.

The defense called a witness who heard a loud crash and two big loud pops.  The witness called 911 and reported she thought she heard gunshots.  The witness later saw that a concrete gate around the house had crashed to the ground.

10

III

DISCUSSION

A

*Discovery*

Galvan contends his state and federal constitutional rights to a fair trial, confrontation, and effective assistance of counsel were violated when the prosecutor provided late discovery regarding two issues: (1) the opinion of the officer who gathered and documented evidence at the scene of the collision regarding his interpretation of the evidence; and (2) the opinion of the prosecution toxicologist regarding the significance of the levels of methamphetamine and marijuana in determining how recently Galvan used the drugs. Galvan contends the late discovery prevented defense counsel from investigating the case, thoroughly advising Galvan, effectively cross-examining witnesses, and presenting a defense. Before we analyze the contentions, we begin with an overview of the general legal principles regarding discovery followed by the pertinent procedural background.

1

*General Legal Principles*

Due process under the United States Constitution requires disclosure of exculpatory or impeaching evidence to a criminal defendant. (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215]; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042–1043 (*Salazar*).) Penal Code sections 1054 through 1054.10 govern discovery in California criminal cases. These provisions are "the only means by which the defendant may compel the disclosure or production of information from prosecuting attorneys …." (Pen. Code, § 1054.5, subd. (a); *People v. Tillis* (1998) 18 Cal.4th 284, 294.)

In relevant part, Penal Code section 1054.1 requires a prosecutor to disclose the "names and addresses of persons the prosecutor intends to call as witnesses at trial" and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (Pen. Code, § 1054.1, subds. (a), (f).) Penal Code section 1054.7 provides that disclosures should be made at least 30 days prior to trial or, if the material or information becomes known within 30 days of trial, "disclosure shall be made immediately."

Before seeking enforcement of the statutory discovery provisions, a defendant must first make an informal request for the desired information and materials. If the information is not produced within 15 days thereafter, a court may make necessary orders to enforce the statutes, "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (Pen. Code, § 1054.5, subd. (b).) "[C]ourts have broad discretion in determining the appropriate sanction for discovery abuse, and recognize that sanctions ranging from dismissal to the giving of special jury instructions *may* be required in order to ensure that the defendant receives a fair trial …." (*People v. Jenkins* (2000) 22 Cal.4th 900, 951.) Courts should consider other remedies before imposing a preclusion sanction. (*People v. Edwards* (1993) 17 Cal.App.4th 1248, 1264–1265.)

We generally review the court's ruling regarding discovery matters for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) "The proper

12

exercise of a trial court's discretion under section 1054.7 does not violate a criminal defendant's confrontation or due process rights." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105.) "Conclusions of law or of mixed questions of law and fact … are subject to independent review." (*Salazar, supra,* 35 Cal.4th at p. 1042.)

2

*Procedural Background*

*a*

To consider the context of Galvan's claims of discovery violations, it is necessary for us to review how the evidence developed from the beginning of the case.

Before the preliminary hearing, defense counsel sought and obtained a continuance for two months to get additional information. As of April 2018, counsel had obtained the mechanical report and was doing a follow-up investigation. Counsel also wanted additional information about the surviving victim's medical condition. The court denied a further continuance stating counsel had sufficient information for the preliminary hearing.

On the day set for the preliminary hearing in April 2018, defense counsel again sought a continuance to further investigate and subpoena the toxicologist regarding the drug levels and the drug interactions. Defense counsel stated the levels in the toxicology report were not particularly high and there was a possible interaction between two drugs. She wanted to explore the issue with an expert. The court denied the request to continue the preliminary hearing.

The prosecutor presented evidence at the preliminary hearing of the toxicology results including the fact that the toxicologist believed marijuana and methamphetamine were used "recently." The prosecutor presented

13

evidence of the toxicology report and the toxicologist's opinion through a law enforcement officer pursuant to Proposition 115. The toxicologist believed Galvan was driving under the influence of methamphetamine and marijuana based on the toxicology results and the results of the field sobriety tests. The officer who relayed the toxicologist's opinions stated they were based on her training, her reading of literature on the effects of methamphetamine and marijuana on the body, as well as workshops, presentations and personal observations.

In June 2018, defense counsel sought and obtained a trial continuance to retain and consult with experts. The prosecutor had provided a list of questions and answers recorded by the officer who spoke with the toxicologist to admit her statements at the preliminary hearing. Defense counsel retained a toxicologist to review the toxicology report and intended to challenge the prosecution's conclusions. Defense counsel also knew the law enforcement officer who investigated the scene held the opinion that the tire exploded as a result of the collision. Defense counsel contested this opinion and retained an accident reconstructionist and master mechanic to examine the photos, reports, and evidence to analyze the officer's conclusion. Defense counsel had two mechanical experts explore the possibility mechanical failure caused the accident as opposed to grossly negligent driving.

*b*

When trial proceeded in late November 2018, defense counsel moved in limine to exclude statements not previously disclosed under Penal Code section 1054.1. Defense counsel requested a hearing under Evidence Code section 402 (402 hearing) regarding the foundation for testimony from the officer who took measurements and documented the scene of the collision and the toxicologist. Defense counsel also sought to exclude the testimony of the

14

officer and the toxicologist as lacking foundation for admissible expert testimony.

Defense counsel challenged a diagram prepared by the officer based on his measurements and documentation of the evidence of the crash scene. Defense counsel also stated it appeared he was merely an officer investigating the scene and she did not have a statement of what he would offer as an expert. The prosecutor said she would call the officer to testify about the evidence he documented at the scene, including where the debris was found "and the significance of its placement." He would not be asked to reconstruct the accident. The court sustained the defense objection to the officer's diagram regarding the path of travel of Galvan's vehicle.

In response to a request for curriculum vitaes (CVs) for prosecution experts, the prosecutor included a CV for the officer. The prosecutor stated she would ask the officer his opinion based on the measurements and observations he made in the field, such as where the tire blew up based on the location of a piece of tire on the sidewalk next to where the truck hit the wall.

The court stated it would allow a 402 hearing to establish foundation for the toxicologist's opinion regarding "recency" of use of methamphetamine and marijuana because the toxicologist's opinions were offered at the preliminary hearing by a police officer pursuant to Proposition 115. Defense counsel said she also wanted to question the toxicologist regarding the interaction of the drugs. The prosecutor explained she had provided defense counsel a statement before the preliminary hearing stating the toxicologist was not excluding one drug or the other as both were present and active at the time of the incident. The prosecutor also said defense counsel could call the toxicologist if she wanted to clarify the testimony. The court confirmed it

15

would allow a 402 hearing regarding recency of use. The court was familiar with the toxicologist's qualifications, but stated it would allow defense counsel to voir dire her on that issue during trial to make a record.

The next morning, the prosecutor stated she spoke to the toxicologist the night before to ask for clarification of the toxicologist's opinion regarding recent use. The prosecutor provided the toxicologist's explanation to defense counsel.

That same morning, defense counsel further argued the officer's testimony about his observations did not require expertise. She requested a witness statement if he intended to testify about inferences to be drawn from the measurements and observations. The court noted the officer had provided a statement by way of his diagram and report. The court also stated there was still time for defense counsel to interview him if she wanted additional details. The court stated it would also allow defense counsel to voir dire the officer on his expertise if she wished. The court also commented that if the prosecutor asked for an expert opinion, she must lay a proper foundation and the court would listen for an objection.

In further discussions that day regarding a statement by the defendant that he had last used methamphetamine three weeks before the incident, defense counsel said she did not understand what the toxicologist was going to testify to regarding the methamphetamine found in Galvan's system and the timeframe for use. The prosecutor explained she had clarified with the toxicologist and verbally advised defense counsel the toxicologist said, " 'in the most extreme scenario, assuming that the overdose level of methamphetamine was taken, the latest back that would go would be 48 hours, which is not three weeks.' "

16

The following morning, defense counsel complained that the prosecutor had sent an email at 7:30 the prior evening with witness statements. She complained these were after the 30-day disclosure deadline. The prosecutor said the officer would offer an opinion that the tire blew out after the car hit the curb based on the location of the debris. The prosecutor also provided a statement from the toxicologist regarding recent use.[1]

Defense counsel argued she was at a disadvantage to being able to effectively cross-examine the officer and the toxicologist. Defense counsel asked for a trial continuance to consult with experts.

The prosecutor stated the email merely summarized the discussion they had with the court the previous day. The statement regarding the toxicologist was in response to defense counsel's request to clarify recent use and was provided to save time with a 402 hearing.

As to the officer's statement, the email said, "the tire fragments location suggest that it impacted when it hit the wall because there wasn't

_____

[1] Defense counsel also complained the email contained a statement that the officer believed the damage to the back of Galvan's truck could not have been caused by a rear-end collision by witness B.G. based on the profile of the vehicles. The prosecutor stated she did ask the officer about the back bumper to respond to Galvan's comment that he thought a truck hit him. The prosecutor had other evidence that Galvan was rear-ended the day before by a different vehicle. The prosecutor pointed out that the issue of how the collision occurred was always an issue and the investigating officer should be allowed to testify as to his observations based on his experience. The court agreed the issue of how damage was caused to the back of Galvan's vehicle had been apparent since the beginning of the case, noting police officers photographed Galvan's back bumper days after the incident. Ultimately, the officer did not offer such an opinion at trial. Other evidence was presented regarding Galvan's prior collision and the fact B.G.'s vehicle had no front-end damage.

any tire in the road." The prosecutor said this was the officer's impression based on his observations rather than new expert testimony.

After a break in the discussion, defense counsel asked for a mistrial or to continue the trial based on the email statements. The court denied the motion for mistrial concluding there was no misconduct and no prejudicial action by the prosecution. The court did not find there were any discovery violations, with the exception of the prosecution's failure to provide a witness list 30 days before trial. However, the court found no prejudice from that delay. The court stated the nature of trials is that both sides continue to speak to their witnesses until they testify and the prosecution was not precluded from exploring the case or continuing to investigate. The statutory obligation requires the prosecution to provide new information to the defense immediately, which was done. The court noted the issue with the toxicologist was evident since the preliminary hearing and anyone could have contacted her earlier for clarification. The court denied a request for trial continuance noting a three-day weekend was approaching.

Before the toxicologist testified, the court conducted a 402 hearing regarding the foundation for her opinion about recent use. The toxicologist said recent use is typically defined as within 48 hours. Based on the amount of methamphetamine and amphetamine in Galvan's blood sample, the toxicologist estimated the use would have been within 48 hours, at most. The level of active compounds for marijuana also strongly indicated use within hours of the blood draw (as opposed to days or weeks).

After the hearing, defense counsel asked for an opportunity to review the literature the toxicologist relied upon to develop cross-examination. The court again stated the issue of recent use had been apparent since the preliminary hearing. The court noted counsel had a long weekend to do

18

additional research.  The court said it would allow defense counsel to recall the toxicologist if the research suggested an area for cross-examination that was not yet apparent.

3

*Analysis*

Based on our review of the entire record, we conclude the court did not abuse its discretion in denying the motion for mistrial or in admitting the testimony of the toxicologist and the investigating officer.  Neither the witnesses nor the statements provided by the prosecutor were a surprise to the defense.

As the trial court determined, the toxicologist's opinion about recent use based on the levels of methamphetamine and marijuana found in Galvan's blood hours after the incident was an issue before the preliminary hearing.  Defense counsel had the toxicology report with the toxicologist's contact information.  " 'Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him.  [Citation.]  If the material evidence is in a defendant's possession *or is available to a defendant through the exercise of due diligence*, then … the defendant has all that is necessary to ensure a fair trial ….' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1134.)  Indeed, defense counsel consulted with a toxicology expert.

Defense counsel extensively cross-examined the toxicologist during trial.  She inquired about the toxicologist's training and qualifications pointing out the toxicologist was not a pharmacologist, a medical doctor, or a neurologist.  Defense counsel cross-examined the toxicologist based on literature describing the use of amphetamines by pilots in World War II and some literature describing medicinal use for methamphetamine.  She

19

questioned the toxicologist regarding the medicinal use of a synthetic form of cannabis and suggested users could build a tolerance that would not impair driving. She pointed out the testing did not establish when Galvan used marijuana and methamphetamine, how much he used, his tolerance, or his level of impairment. Defense counsel pointed out there is not an established half-life for marijuana and questioned the toxicologist's conclusions regarding the window of use within 48 hours based on the half-life for methamphetamine.

Similarly, the issue of the investigating officer's testimony about when or how the tire blew was not new. As early as June 2018, defense counsel knew the law enforcement officer who investigated the scene held the opinion that the tire popped as a result of the collision and defense counsel had retained two experts to analyze this opinion. At that time, defense counsel had witness statements, photos and the collision report, which included a diagram of where evidence was found and showed no evidence collected in the street. Defense counsel retained experts prior to trial to evaluate this evidence as well as a possible defense based on mechanical failure. Although these experts did not testify, defense counsel cross-examined the investigating officer regarding his investigation and opinion. Defense counsel pointed out the officer did not document some items of debris in the roadway, which he did not believe were connected to the incident, and he did not thoroughly examine the tires.

Galvan has established no prejudicial misconduct on the part of the prosecutor in providing an email summary during trial clarifying the anticipated testimony of these two witnesses. There was no prejudicial discovery violation and no violation of his rights to due process, confrontation, or effective assistance of counsel.

## B

### *Jury Instructions*

Galvan contends his constitutional rights were violated and counts 1 and 2 should be reversed because the court declined to instruct the jury regarding accident as a defense and declined to provide an instruction regarding proximate cause.  We consider each instruction after setting forth general legal principles and a summary of the instructions given.

### 1

### *General Principles*

Generally, "a trial court must give a requested jury instruction if there is substantial evidence in the record supporting such an instruction. [Citation.]  'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." '  [Citation.]  'On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence—evidence that, if believed by a rational jury, would have raised a reasonable doubt as to' an element of the crime in question." (*People v. Mitchell* (2019) 7 Cal.5th 561, 583 (*Mitchell*).)

We independently review claims of instructional error, including the legal adequacy of jury instructions.  (*Mitchell, supra,* 7 Cal.5th at p. 579, citing *People v. Cole* (2004) 33 Cal.4th 1158, 1210.)  "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law ….'  [Citation.]  ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury

21

instructions which are given. [Citation.]" ' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.)

## 2

### *Instructions Given*

#### *a*

For count 1, gross vehicular manslaughter while intoxicated, the court instructed the jury with CALCRIM No. 590, which advised the jury the People were required to prove: "1. The defendant drove under the influence of a drug; [¶] 2. While driving that vehicle under the influence of a drug, the defendant also committed an infraction; [¶] 3. The defendant committed the infraction with gross negligence; [¶] AND [¶] 4. The defendant's grossly negligent conduct caused the death of another person." The instruction defined gross negligence as "more than ordinary carelessness, inattention or mistake in judgment" and advised the jury a person "acts with gross negligence when he or she acts in a reckless way that creates a high risk of death or great bodily injury; and a reasonable person would have known that acting in that way would create such a risk." It advised the jury that gross negligence "is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." It further stated that the combination of driving a vehicle under the influence of a drug and violating a traffic law was not enough to establish gross negligence.

At the request of the defense, the court gave the bracketed portion of CALCRIM No. 590 for a person facing imminent peril, which stated, "A person facing a sudden and unexpected emergency situation not caused by

22

that person's own negligence is required only to use the same care and judgment that an ordinarily careful person would use in the same situation, even if it appears later that a different course of action would have been safer." The court stated it did not believe this was a proximate cause case. Defense counsel agreed the bracketed portions of CALCRIM No. 590 regarding natural and probable consequences and multiple causes were not applicable.

*b*

For count 2, causing injury to another person while driving under the influence of a drug, the court instructed the jury with CALCRIM No. 2100, which required the prosecution to prove: "1. The defendant drove a vehicle; [¶] 2. When he drove a vehicle, the defendant was under the influence of a drug; [¶] 3. While driving a vehicle under the influence, the defendant also committed an illegal act or neglected to perform a legal duty; [¶] AND [¶] 4. The defendant's illegal act or failure to perform a legal duty caused bodily injury to another person." This instruction further explained a person is under the influence "if, as a result of taking a drug his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances." It defined ordinary care as "using reasonable care to prevent reasonably foreseeable harm to someone else. A person fails to exercise ordinary care if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation."

*c*

After the court instructed the jury and excused the jury for a break before closing arguments, defense counsel asked the court to instruct with

23

CALCRIM No. 3404 regarding the accident defense. The court and counsel reviewed the use notes for CALCRIM No. 3404 along with secondary authority cited therein and the case of *People v. Boulware* (1940) 41 Cal.App.2d 268, 269–270 (*Boulware*), which involved a drunk driver who swerved to avoid an oncoming truck.

Defense counsel argued Galvan heard a loud noise and reacted to it, like a driver who swerves to avoid a car. Counsel also asked the court to give the bracketed portion of CALCRIM No. 590 regarding natural and probable consequence based on the *Boulware* case. Defense counsel argued they did not know the cause of the sound and there was evidence of free play in the wheel going to the issue of causation.

The court declined to give the accident instruction stating the jury had been "well instructed on the mental state that has to be found and the different degrees of negligence." The court also declined to give a proximate cause instruction noting it was a factor already given. The court again said it did not see a proximate cause issue. The court did not believe a reasonable jury following the law could conclude the loud noise was the proximate cause of the victims' injuries.

3

*Accident*

Penal Code section 26 states the statutory defense of accident: "All persons are capable of committing crimes except those belonging to the following classes: [¶] … [¶] Five—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."

The Supreme Court has stated "statutory provisions codifying 'a defense for an actor who commits the act or omission constituting an offense

24

"through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." … [¶] … have historical significance, [but] are now unnecessary restatements, in a defense format, of the requirements of the definitional elements of an offense.  To say that it is a defense that the criminal conduct or omission was committed by a non-negligent accident, is simply to say that all result element offenses [i.e., offenses that require an intent to produce a particular result] require at least proof of negligence as to causing the prohibited result.  This is already made clear by the culpability requirements of specific offense definitions ….'  [Citation.]  A trial court's responsibility to instruct on accident therefore generally extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime."  (*People v. Anderson* (2011) 51 Cal.4th 989, 997.)

CALCRIM No. 3404 describes the defense of accident for crimes involving criminal negligence as follows:  "The defendant is not guilty of [the charged crime] if (he/she) acted or failed to act accidentally without criminal negligence.  You may not find the defendant guilty of [the charged crime] unless you are convinced beyond a reasonable doubt that (he/she) acted with criminal negligence."

The use notes for CALCRIM No. 3404 refer to 1 Witkin & Epstein, California Criminal Law (4th ed. 2020), Defenses section 273, which explains the principal application of the accident defense is in the law of homicide.  However, in citing examples of a few other situations where accident defense applied, the use note includes the *Boulware* case relied upon by Galvan.  The court in *Boulware* held an instruction regarding imminent peril should have been given when a drunk driver testified he swerved to avoid an approaching

car and collided with another vehicle. (*Boulware, supra*, 41 Cal.App.2d at pp. 269–270.)

The use notes for the vehicular manslaughter instructions, CALCRIM Nos. 590 through 592, also cite the *Boulware* case and advise, "If there is sufficient evidence and the defendant requests it, the court should instruct on the imminent peril/sudden emergency doctrine." The use notes direct the court to give the following bracketed language: "A person facing a sudden and unexpected emergency situation not caused by that person's own negligence is required only to use the same care and judgment that an ordinarily careful person would use in the same situation, even if it appears later that a different course of action would have been safer." (Use Notes to CALCRIM Nos. 590–592.) This language tracks the language approved by the court in *Boulware, supra*, 41 Cal.App.2d at pages 269–270.[2]

Thus, although the court declined to give CALCRIM No. 3404 as a pinpoint instruction for the accident defense, it instructed the jury with the language approved in *Boulware* for accident in the face of imminent danger

---

[2] In *Boulware*, the defendant requested the following instruction: " 'A person who, without negligence on his part, is suddenly confronted with unexpected and imminent danger, either to himself or to others, is not expected, nor required, to use the same judgment and prudence that is required of him in the exercise of ordinary care, in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise if confronted with the same unexpected danger, under the same circumstances. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by any ordinarily prudent person under the same conditions, he does all the law requires of him, although, in the light of after-events, it should appear that a different course would have been better and safer.' " (*Boulware, supra*, 41 Cal.App.2d at pp. 269–270, italics omitted.) The *Boulware* court stated the proposed instruction "correctly stated the law *apropos* to defendant's theory of the reason for the accident." (*Id.* at p. 270.)

26

in the instruction for gross vehicular manslaughter while intoxicated (CALCRIM No. 590) and in each of the lesser included offenses to count 1, which included vehicular manslaughter while intoxicated with ordinary negligence (CALCRIM No. 591), gross vehicular manslaughter (CALCRIM No. 592), and misdemeanor vehicular manslaughter (CALCRIM No. 593).

Additionally, the jury was fully instructed regarding the applicable degrees of criminal negligence (from gross negligence to ordinary negligence) required for Galvan to be convicted of the charged crimes or the lesser included offenses. Defense counsel argued Galvan did not have the criminal intent for the charged crimes. Counsel argued he was scared by a loud noise and responded by turning the wheel, which had five inches of free play. In finding Galvan guilty of gross vehicular manslaughter while intoxicated the jury necessarily rejected the defense theory that Galvan acted without criminal negligence.

Therefore, even assuming the court erred in not giving the accident instruction on request, the error was not structural and was harmless under any standard. (*Chapman v. Cal.* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 3

### *Proximate Cause*

For count 1, the jury was instructed they must find Galvan's "grossly negligent conduct caused the death of another person." For count 2, causing injury to another person while driving under the influence of a drug, the jury was instructed they must find Galvan's illegal conduct in driving a vehicle under the influence "caused bodily injury to another person."

The use notes for the vehicular manslaughter instructions state, "[i]f causation is at issue, the court has a sua sponte duty to instruct on proximate

27

cause." (Use Note to CALCRIM Nos. 590–593, citing *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590–591.) In *Bernhardt*, two doctors of chiropractic medicine were charged with manslaughter when a patient under their care died shortly after giving birth to a child. (*Id.* at pp. 570–571.) There was conflicting evidence regarding whether the patient's death was caused by postpartum hemorrhage due to the criminally negligent conduct of the defendants or by an embolism for which no act of any defendant was responsible. The court concluded it was error to fail to instruct on proximate causation in such a situation. (*Id.* at pp. 590–591.)

Here, in contrast, there was undisputed medical evidence that the death of S.A. and the significant injuries to C.S. were caused by the trauma of Galvan's vehicle running over them after he drove over a curb and down the sidewalk. There was no evidence either S.A. or C.S. had an unrelated medical condition that contributed to their injuries or, in the case of S.A., his death.

There was also no evidence of an unforeseeable intervening or contributing cause for their injuries. This was not a situation, for example, where Galvan's conduct set off a chain reaction that ultimately resulted in the injuries and death. Although there was some evidence of free play in the steering wheel, there was absolutely no evidence this was an unforeseeable intervening cause. Galvan testified he had no problems with braking or steering the truck. The officer who inspected Galvan's vehicle testified there were no mechanical issues that could have caused a catastrophic failure.

Thus, the issue for the jury was not causation, but whether Galvan acted with gross negligence in driving the vehicle while impaired which ultimately caused the victims' injury and death. The evidence established that Galvan drove while under the influence of both methamphetamine and

28

marijuana and, after making an unindicated left turn, he abruptly turned back toward the main roadway in such a reckless manner that his vehicle jumped a curb, hit a wall, and he drove on the sidewalk for more than 50 feet without hitting the brakes before running over S.A. and C.S. and crashing into a concrete pillar.

Having rejected the defense arguments that Galvan did not act with gross negligence, no reasonable jury could have found that Galvan's actions were not a substantial factor in causing S.A.'s death and C.S.'s injuries. (*People v. Burnett* (2003) 110 Cal.App.4th 868, 879, citing *People v. Bland* (2002) 28 Cal.4th 313, 338.)  Therefore, even if we were to assume it was error not to instruct the jury with language regarding natural and probable consequences, such error was harmless under any standard.

C

*Convictions for Vehicular Manslaughter and DUI Causing Injury*

To preserve the issue for further review, Galvan contends the judgment of guilt for count 2 should be vacated based upon the double jeopardy clause and Penal Code sections 654 and 1023 because he committed only one criminal act by driving while under the influence of drugs, but was convicted of two criminal offenses.

The Supreme Court held in *McFarland*, *supra*, 47 Cal.3d 798 that a defendant driving under the influence in one incident may be convicted and punished separately for vehicular manslaughter with gross negligence as to one victim, which is a crime of violence under the Penal Code, and for drunk driving causing injury to another victim, which is a violation of the Vehicle Code.  (*Id.* at pp. 803–804.)  Galvan acknowledges we are bound by this precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We also conclude count 2 as to victim C.S. is not a lesser included

29

offense of count 1 because separate victims are involved. (See *People v. Reed* (2006) 38 Cal.4th 1224, 1231; *McFarland*, at p. 804.)

D

*Count 2 Great Bodily Injury Enhancement Under Penal Code Section 12022.7*

The jury found true an allegation that Galvan personally inflicted great bodily injury on S.A. within the meaning of Penal Code section 12022.7, subdivision (a) in connection with Galvan's count 2 conviction for driving under the influence of drugs causing injury to C.S. (Veh. Code, § 23153, subd. (f)). Although the trial court stayed punishment for this enhancement under Penal Code section 654, Galvan contends the true finding of great bodily injury as to S.A. should be stricken pursuant to Penal Code section 12022.7, subdivision (g) because he was separately convicted of gross vehicular manslaughter in count 1 for the death of S.A. We disagree.

Penal Code section 12022.7, subdivision (a) provides, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

However, Penal Code section 12022.7, subdivision (g) limits the application of this enhancement for certain offenses: "This section shall not apply to murder or manslaughter or a violation of Section 451 [arson] or 452 [unlawfully causing a fire]. Subdivisions (a), (b), (c), and (d) shall not apply if infliction of great bodily injury is an element of the offense."

In *People v. Cook* (2015) 60 Cal.4th 922, the Supreme Court addressed the question of whether a defendant convicted of multiple counts of gross vehicular manslaughter may be subjected to sentencing enhancements for great bodily injury inflicted on deceased victims in other manslaughter

30

counts or for injuries inflicted on a surviving victim.  (*Id*. at p. 925.)  The Supreme Court concluded "subdivision (g) of [Penal Code] section 12022.7 means what it says:  Great bodily injury enhancements do not apply to a conviction for murder or manslaughter.  A defendant convicted of murder or manslaughter who also commits crimes against other victims may be convicted of those additional crimes and, to the extent the sentencing laws permit, punished separately for them.  But the sentence for manslaughter may not be enhanced for the infliction of great bodily injury as to anyone." (*Id*. at p. 924.)  Because the issue was not presented in the case before it, the Supreme Court did not reach the question of "whether and, if so, how great bodily injury enhancements may attach to other crimes for a defendant who is convicted of murder or manslaughter as well as those other crimes."  (*Id*. at p. 938, fn. 3.)

The case of *People v. Lamb* (2017) 8 Cal.App.5th 137, 139 involved a defendant convicted of both involuntary manslaughter and assault by means of force likely to produce great bodily injury as to a single victim.  The *Lamb* court concluded Penal Code section 12022.7, subdivision (g) prohibits the enhancement for charged offenses involving "murder, manslaughter, arson, unlawfully causing a fire, or an offense whose elements include the infliction of great bodily injury," but the statute is "silent as to whether it applies to other offenses brought within the same criminal proceeding."  (*Id*. at p. 144.) The court concluded the trial court did not err in imposing the great bodily injury enhancement for a nonprohibited crime, such as assault, and staying punishment for that enhancement pursuant to Penal Code section 654.  (*Id*. at pp. 139, 145.)

Likewise, Galvan's conviction for driving under the influence of drugs causing injury to C.S. (Veh. Code, § 23153, subd. (f)) is not an offense for

which Penal Code section 12022.7, subdivision (g) prohibits application of the great bodily injury enhancement of Penal Code section 12022.7, subdivision (a). The fact S.A. died because of the great bodily injury and Galvan was separately convicted for his manslaughter does not change the analysis as to the application of the great bodily injury enhancement to count 2. Therefore, the court did not err in imposing, but staying, the punishment for the great bodily injury enhancement for S.A. in connection with Galvan's conviction for count 2.

## E

### *Fines and Fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Galvan contends the court violated his constitutional rights of due process and protection against excessive fines by imposing fines and fees without determining he has the ability to pay them. Galvan asks us to vacate the fines and fees unless and until the trial court holds an ability to pay hearing. The People contend the restitution fine was constitutional and any due process violation in imposing the non-punitive fees without a determination of Galvan's ability to pay was harmless beyond a reasonable doubt. We conclude Galvan forfeited this claim.

"At the core of the *Dueñas* opinion is its holding that imposition of fines, fees or assessments without a hearing on ability to pay denies due process. It was that court's view it was the trial court's duty to hold a hearing and thus failure to seek a hearing did not result in forfeiture. Further, the court found that the burden to prove 'present' ability to pay was on the prosecution. Other courts, including this court, have disagreed with *Dueñas* on these key principles." (*People v. Keene* (2019) 43 Cal.App.5th 861, 863; see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 327, review granted

32

Nov. 26, 2019, S258946 [rejecting the *Dueñas* due process analysis for fines and fees]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061 [applying excessive fine analysis for restitution fines]; and *People v. Kopp* (2019) 38 Cal.App.5th 47, 95–96 (*Kopp*), review granted Nov. 13, 2019, S257844 [concluding a defendant who requested ability to pay hearing bears burden of proof and applying due process analysis to court assessments and excessive fines analysis to restitution fines].)

We conclude it is not necessary for us to reach these broader issues in this case and it is not prudent for us to do so given that the Supreme Court is currently considering the viability of *Dueñas* as it pertains to a criminal defendant's ability to pay assessed fines and fees.

The jury here returned guilty verdicts in December 2018, and sentencing was set for January 11, 2019. Galvan's probation report recommended a maximum restitution fine of $10,000 (Pen. Code, § 1202.4) and various assessed fees totaling an additional $364.[3]

After the judge indicated he planned to "impose fines and fees outlined by Probation", defense counsel asked the court to "consider reducing the restitution fine based on an inability to pay." Counsel did not suggest an amount, nor did she otherwise comment on what Galvan could conceivably pay. When the court responded that it would reduce the restitution fine to $2,000, counsel said nothing further.

Penal Code section 1202.4 authorizes a restitution fine of up to $10,000 in felony cases, and requires a sentencing court to impose a minimum fine of $300 notwithstanding a defendant's inability to pay that amount. *Dueñas*

---

[3] The fees and assessments included $120 in court security fees (Pen. Code, § 1465.8); a $90 conviction assessment (Gov. Code, § 70373); and a $154 criminal justice administration fee (Gov. Code, § 29550.1).

considered whether a minimum fine imposed under the statute was constitutional. But even before the *Dueñas* decision, which was issued only three days before Galvan's sentencing hearing, it was clear that a defendant's ability to pay was a relevant consideration in determining whether to impose a restitution fine greater than the statutory minimum. (§ 1202.4, subds. (c) and (d).) This likely explains why Galvan's counsel asked the court to reduce the amount of the restitution fine without mentioning *Dueñas*.

It was defendant's burden to explain to the court why it should impose a lesser amount than was proposed. (§ 1202.4, subd. (d); *People v. Avila* (2009) 46 Cal.4th 680, 729 (*Avila*).) Notwithstanding some broad language in *Dueñas*, cases since then—including decisions from the same court that decided *Dueñas*—have concluded that even when challenging a minimum fine, defendants bear the initial burden of (1) advising the court that they are unable to pay the fines and/or fees that the court proposes to assess, and (2) introducing minimal evidence to support that assertion. (E.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed"]; *Kopp, supra*, 38 Cal.App.5th at p. 96 ["it is Appellants' burden to make a record below as to their ability to pay these assessments"].) The failure to do so means an appellate challenge based on ability to pay is forfeited. (*Avila*, at p. 729.)

This is not a case in which defense counsel totally failed to mention the defendant's inability to pay. But counsel never quantified what she believed Galvan was reasonably able to pay. When the sentencing judge proposed an 80 percent reduction of the amount suggested by the probation department, counsel raised no objection. Her silence may be deemed acquiescence.

Galvan was obligated to tell the court not merely that the maximum fine of $10,000 was excessive, but also that the $2,000 proposed by the trial judge was too much if he was unable to pay that amount.  Having failed to do so, the argument regarding his inability to pay the assessed restitution fine is forfeited.  (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)  Moreover, because he did not object to the $2,000 restitution fine, Galvan has similarly forfeited any challenge to the fees and assessments totaling $364.  (*Ibid.*)

F

*Cumulative Error*

Because we find no prejudicial error as to each of Galvan's asserted claims, it follows that any cumulative effect of the claimed errors " 'does not warrant reversal of the judgment.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 825.)

G

*Prior Prison-Term Enhancements*

Galvan admitted, and the court found true, an allegation he had a prior prison term for assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).  The court imposed a one-year term pursuant to former Penal Code section 667.5, subdivision (b), but stayed the punishment.

While this appeal was pending, the Governor signed Senate Bill No. 136 (Stats. 2019, ch. 590, § 1), which amended Penal Code section 667.5, subdivision (b) to eliminate one-year sentence enhancements for all prior prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b).  The amendment became effective January 1, 2020.  Although Galvan did not raise this issue on appeal or request supplemental briefing on this point, we may

35

consider and correct an unauthorized sentence at any time. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887.)

Galvan is entitled to the ameliorative change in the law under the amended statute because the judgment against him is not yet final. (*In re Estrada* (1965) 63 Cal.2d 740; *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.) Since his prison prior does not qualify for enhancement under amended Penal Code section 667.5, subdivision (b), the one-year prior prison term enhancement can no longer be imposed. (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772.) Because the trial court stayed the imposed term, we conclude it is unnecessary to remand the matter for the court to exercise its sentencing discretion anew. (*People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.) Accordingly, we strike the one-year prior prison enhancement and affirm the judgment as modified.

## IV

## DISPOSITION

The judgment is modified to strike the stayed one-year prior prison term enhancement imposed under former Penal Code, section 667.5, subdivision (b). As so modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment accordingly and to forward it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

AARON, J.

DATO, J.

37